```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MINNESOTA
                     Civil No. 09-1173(DSD/XXX)
```

Albert Lee Hubbell,

       Plaintiff,

v.                                                                 **ORDER**

Better Business Bureau of
Minnesota, a Minnesota
corporation and Anne Gallagher,
a Minnesota resident,

       Defendants.

> David W. Larson, Esq., Pamela M. Harris, Esq. and Martin & Squires, 444 Cedar Street, Suite 2050, St. Paul, MN 55101, counsel for plaintiff.
>
> Thomas E. Marshall, Esq., Gina K. Janeiro, Esq. Nora R. Kaitfors, Esq. and Jackson Lewis, 225 South Sixth Street, Suite 3850, Minneapolis, MN 55402, counsel for defendants.

This matter is before the court upon the motion for summary judgment by defendant Better Business Bureau of Minnesota[1] (BBB). Based on a review of the file, record and the proceedings herein, and for the following reasons, the court grants the motion.[2]

---

[1] The actual name of defendant is the Better Business Bureau of Minnesota & North Dakota.

[2] The court finds plaintiff's motion to strike [ECF No. 66] to be without merit. Moreover, the court does not rely on the challenged material in its analysis. Therefore, the court denies the motion.

BACKGROUND

This disability discrimination action arises out of the termination of plaintiff Albert Lee Hubbell by the BBB on December 5, 2008. Hubbell began working at the BBB as president and CEO in March 2006. Hubbell reported to the chair of the Board of Directors (Board) and an Executive Committee composed of Board officers and other Board members. During Hubbell's tenure, the BBB increased revenues, and he received positive evaluations and annual increases in salary and bonuses from the Board.

In May 2008, Hubbell told a number of his employees, including Barb Grieman,[3] that he had been diagnosed with bipolar disorder. See Schmid Aff. ¶ 3; Hubbell Dep. 167. Hubbell also told Board chair-elect Anne Gallagher, who told Executive Committee members John Bruder and John Packard. In July 2008, Hubbell hired Leslie Baughn, with whom he had previously worked in Nashville. She and Hubbell introduced a "Trust Card" for employees to use as part of payroll. Hubbell was aware that Baughn was having an affair with the owner of the Trust Card business, but did not disclose this relationship to the Board. See Hubbell Dep. 104-05; Gallagher Dep. 133-35.

---

[3] Grieman claims that Hubbell did not tell her that he had bipolar disorder. Grieman Dep. 17.

In August 2008, the executive committee performed a "360 degree review" in which Hubbell received positive evaluations. Janeiro Decl. Ex. X. Packard said:

> When reviewing an individual, I ask to [sic] simple questions: 1. Knowing what I know today would I still hire this individual and 2. am I proud to introduce this person to our customers, vendors, and partners? In Bert's case, the answer is a resounding "absolutely"!!!!!!!!

Id. Ex. Y. As a result of the reviews, Gallagher recommended and the Executive Committee approved a $67,846 bonus and an increase in base salary from $96,500 to $155,000. Id. Ex. Z.

In September 2008, the Board received an anonymous letter alleging that Hubbell made sexually suggestive comments at work and while drinking with employees and had vomited on an employee while drunk.[4] Id. Ex. F. In response, Gallager interviewed Hubbell and twenty-three BBB employees. Her investigation did not confirm the allegations. Instead, it was "180 degrees opposite the allegations in the letter." Id. Ex. CC. Gallagher reported her results to the Executive Committee, which determined that further action was not needed.

On November 21, 2008, Grieman asked to talk with Bruder confidentially. Bruder declined. Bruder instructed Grieman to talk to Gallagher and contacted Gallagher to tell her about

---

[4] Discovery revealed that Grieman was the author of the anonymous letter.

Grieman's request. Gallagher met with Grieman on November 24, 2008. At the meeting, Grieman shared a list of allegations about Hubbell, including that he had invoiced members more frequently than standard practice, misstated future income, asked Grieman to stay away from Board meetings, ended or reduced meetings, used BBB materials to make color copies for non-BBB business, and gave business to a person with whom an employee was having an affair. See id. Ex. J.

Gallagher initiated an investigation with the help of BBB outside counsel. As a part of the investigation, Gallagher set up a meeting with Hubbell on December 1, 2008, at the offices of BBB counsel. In the interim, Grieman wrote to Gallagher to say that she was concerned about how Hubbell might react. Gallagher responded by asking whether Hubbell might hurt himself or others. At the December 1 meeting, Hubbell stated that he had not attended a happy hour since the September letter and stopped attending manager meetings for awhile. Hubbell admitted that he knew about the personal relationship between Baughn and the owner of the Trust Card business and that he had copied 30,000 fliers at the BBB in August but implied they were for the BBB to be distributed in KSTP[5] bags at the Minnesota State Fair. Hubbell Dep. 133-34, 229. The next day, Hubbell sent an email to Gallagher admitting that the 30,000 fliers "were in fact reproduced and inserted for

---

[5] KSTP is a radio and television station.

distribution at the state fair" for a "former BBB employee, Mike Kearney." Hubbell Dep. Ex. 58. Hubbell stated that he intended to reimburse the BBB "when the printing bill is received." Id.

On December 2, 2008, the Executive Committee met by conference call to discuss the allegations and admissions. The Executive Committee agreed that further follow-up was needed. Gallagher then contacted Katie Schactner at KSTP to ask about the 30,000 fliers. Schactner reported that Hubbell had tried to contact her numerous times in the previous few days. Schactner also confirmed that the fliers were not for the BBB but rather for Kearney's business. On December 4, 2008, the Executive Committee met again and had "considerable discussion" about how to address Hubbell. The Executive Committee voted unanimously to terminate Hubbell.

On March 3, 2009, Hubbell filed a charge of discrimination with the Equal Employment Opportunity Commission and requested a right-to-sue letter. He received the letter on March 9, 2009. On May 19, 2009, Hubbell began this action claiming that the BBB unlawfully discriminated against him in violation of the Americans with Disabilities Act (ADA)[6] and Minnesota Human Rights Act (MHRA). Thereafter, on May 12, 2010, then-CEO Dana Badgerow and Grieman stated to staff that Hubbell was terminated partly "because he

---

[6] The complaint alleges violation of the ADA, yet the prayer for relief appears to be copied from another complaint seeking relief under Title VII of the Civil Rights Act of 1964. The court understands that Hubbell's claims fall under the ADA and does not address Title VII.

couldn't handle the complications of his bipolar disorder" and "the Board just didn't feel comfortable with Bert's erratic behavior caused by his mental illness."  See Gerding Aff. ¶¶ 4, 5; Boehm Aff ¶¶ 4, 5.  Defendants move for summary judgment.  The court now considers the motion.

## DISCUSSION

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c);[7] see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material only when its resolution affects the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party.  See id. at 252.

On a motion for summary judgment, the court views all evidence and inferences in a light most favorable to the nonmoving party.  See id. at 255.  The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings but must set forth specific facts sufficient to raise a genuine issue for trial.  See

---

[7] The court cites the Federal Rules of Civil Procedure in effect at the time of the motions and hearing.  Changes effective December 1, 2010, do not affect the outcome of this case.

Celotex, 477 U.S. at 324. Moreover, if a plaintiff cannot support each essential element of his claim, the court must grant summary judgment because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Id. at 322-23.

Hubbell alleges that the BBB unlawfully terminated him because it regarded him as disabled in violation of the ADA and MHRA. See 42 U.S.C. § 12102(1)(C);[8] Minn. Stat. §§ 363A.02 & 363A.03 subdiv. 12.[9] An employee is regarded as having a disability when "(1) the employer mistakenly believes the individual has an impairment that substantially limits one or more major life activities, or (2) the employer mistakenly believes an actual, non-limiting impairment substantially limits one or more of the individual's major life activities. Pittari v. Am. Eagle Airlines, Inc., 468 F.3d 1056, 1061 (8th Cir. 2006) (citation omitted). To survive the BBB's motion for summary judgment, Hubbell must either present direct evidence of discrimination or establish an inference of unlawful

---

[8] The events that give rise to this action occurred in 2008, before ADA amendments effective on January 1, 2009. The parties did not urge the court to use the amended statute, and the amendments do not apply. Nyrop v. Indep. Sch. Dist. No. 11, 616 F.3d 728, 734 n.4 (8th Cir. 2010).

[9] The analysis of claims under the ADA and MHRA is the same, except that the MHRA applies a "less stringent" standard of "materially limiting" than the ADA standard of "substantially limiting." See Kirkeberg v. Canadian Pac. Ry., 619 F.3d 898, 908 (8th Cir. 2010) (citing Sigurdson v. Carl Bolander & Sons, Inc., 532 N.W.2d 225, 228 (Minn. 1995)).

7

discrimination through the burden-shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973)). See Norman v. Union Pac. R.R. Co., 606 F.3d 455, 459 (8th Cir. 2010).

Hubbell does not allege that the Executive Committee possessed discriminatory animus or regarded him as disabled.[10] See Pl.'s Mem. Opp'n 23. Rather, he claims that Grieman regarded him as disabled, and therefore her discriminatory animus is imputed to the Executive Committee though a "cat's paw" theory of liability. "An employer cannot shield itself from liability for unlawful termination by using a purportedly independent person or committee as the decisionmaker where the decisionmaker merely serves as the conduit, vehicle, or rubber stamp by which another achieves his or her unlawful design." Dedmon v. Staley, 315 F.3d 948, 949 n.2 (8th Cir. 2003); see also Qamhiyah v. Iowa State Univ. of Sci. & Tech., 566 F.3d 733, 724-45 (8th Cir. 2009) (collecting cases and analyzing cat's paw liability in Eighth Circuit). This theory of liability arises from agency principles contained in the Age Discrimination in Employment Act (ADEA). See Shager v. Upjohn Co., 913 F.2d 398, 404-05 (7th Cir. 1990). Both the ADEA and ADA define

---

[10] Of the six members of the Executive Committee, only Gallagher, Packard and Bruder knew that Hubbell claimed to have been diagnosed with bipolar disorder. See Gallagher Dep. 74-75; Packard Dep. 37-39. No evidence suggests that any of the three regarded him as limited. Indeed, the record shows that both Gallagher and Packard regarded him as highly capable. See Hubbell Dep. 87-88; Packard Dep. 31; Janerio Aff. Ex. Q, at 295; Janerio Aff Exs. U, Y (email from Packard to Gallagher), Z (letter from Gallagher to Hubbell).

8

an employer to include its agents. See 29 U.S.C. § 630(b); 42 U.S.C. § 12111(5)(A). Thus, the court finds that the theory also applies in the ADA context.

Under agency principles, an agent only acts on behalf of her principal when she has actual or apparent authority to do so. See Restatement (Second) of Agency §§ 7, 8, 219, 228. As a result, cases applying cat's paw liability involve a biased supervisor — one who has authority to act in regard to the employment of the plaintiff — using an independent decision maker as a conduit to take adverse action against an employee. See Qamhiyah, 566 F.3d at 724-45; Richardson v. Sugg, 448 F.3d 1046, 1059-60 (8th Cir. 2006); Dedmon, 315 F.3d at 949 n.2; Kramer v. Logan Cnty. Sch. Dist. No. R-1, 157 F.3d 620, 624 (8th Cir. 1998); Lacks v. Ferguson Reorganized Sch. Dist. R-2, 147 F.3d 718, 724-25 (8th Cir. 1998); Stacks v. Sw. Bell Yellow Pages, Inc., 27 F.3d 1316, 1323 (8th Cir. 1994), Kientzy v. McDonnell Douglas Corp., 990 F.2d 1051, 1057 (8th Cir. 1993). But see Russell v. City of Kansas City, Mo., 414 F.3d 863, 867 n.1 (8th Cir. 2005) (suggesting that allegations of workplace discrimination by subordinate employee may form basis of cat's paw liability when decision maker fails to investigate). In this case, Hubbell was Grieman's supervisor: Grieman had no authority to take any action against Hubbell. As a result, the cat's paw theory is inapplicable, and Hubbell's claim fails.

Even if cat's paw liability extends to subordinate employees who act outside of their scope of authority, Hubbell's claim fails because the Executive Committee performed an independent investigation. During its investigation, Hubbell admitted to misusing BBB resources to make 30,000 color copies for non-BBB purposes. Hubbell also admitted to knowledge that an employee was romantically involved with a person who would benefit use of the Trust Card by the BBB. Based on Hubbell's admissions, further inquiry was not needed. Following the investigation and two meetings, the Executive Committee unanimously determined that termination was warranted. Grieman made no recommendation, nor did she speak to the Executive Committee while it contemplated action. In short, there is no evidence that the Executive Committee "served as the conduit, vehicle or rubber stamp" by which Grieman "achieved her unlawful design." Qamhiyah, 566 F.3d at 745. Therefore, Hubbell's claim fails, and summary judgment is warranted.

## CONCLUSION

Accordingly, based on the above, **IT IS HEREBY ORDERED** that:

1. Plaintiff's motion to strike [ECF No. 66] is denied; and

2. Defendant's motion for summary judgment [ECF No. 35] is granted.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: December 27, 2010

                                                s/David S. Doty
                                                David S. Doty, Judge
                                                United States District Court